## Oesterling's Appeal

*George M. O'Hara*, for appellant.

*J. R. Heyison*, for Secretary of Revenue.

McCRACKEN, P. J., September 29, 1942.—The license of appellant to operate a motor vehicle was suspended for a period of 90 days because he drove his car in excess of 50 miles per hour. An appeal has been taken from the action of the Secretary of Revenue, and a hearing held. Several such appeals in this court are not disposed of. We will express our views here as governing not only this case, but also others of similar kind.

Under the provisions of the Act of June 27, 1939, P. L. 1135, sec. 1002(*b*), the speed of motor vehicles of the type operated by appellant is limited to 50 miles per hour. For a violation of this section a penalty of "ten ($10) dollars and costs of prosecution, and, in default of the payment thereof, shall undergo imprisonment of not more than five (5) days", is provided. It is well known that for some time past one violating the above section has suffered the additional penalty of a 90-day suspension of his operator's privilege.

This practice has been followed, so we understand, without regard to the manner of operation, the surrounding conditions, or any other facts that might differentiate one violation from another. It partakes of the nature of enforcement of law by fiat rather than

by legislative authority. It has been said that "the law of the Medes and Persians change not." Under the government of Rome the laws were harsh and inflexible. In fact, in the early common law, penalties for criminal offenses were rigid. The old Mosaic Law exacted "an eye for an eye and a tooth for a tooth." Throughout this rather long period the law took no account of extenuating circumstances, the mental capacity of the offender, his age, or of many facts which, we now know, are proper for consideration in determining the degree of guilt. In the administration of criminal law there has been a slow evolutionary process and a new concept has been formed. We now have the indeterminate sentence; the law with respect to juveniles charged with the commission of crime; acts which relate especially to women violators of law. All these and others which might be cited show a tendency on the part of the legislature to individualize crime and not to make it a mass affair.

We cannot overlook the place of the motor vehicle in modern life. The operation of trucks, buses, taxicabs, and other means of transporting goods and people constitute the' only means of earning a living for many persons. Many others use the public highways for legitimate business purposes. In fact, our whole social, business, and economic life is ordered and based upon the use of motor power upon the highways. Modern life could not be maintained without the means of transportation afforded by the motor vehicle. On the other hand, we must not be unmindful of the fact that a motor vehicle of whatever kind is capable of high speed and tremendous power, and is thus an instrument dangerous not only to the operator thereof, but also to other users of the public highway. Its operation must, therefore, be rigidly controlled and regulated in order to safeguard all who might be endangered.

" 'Motor vehicles are dangerous machines; and, even when skilfully and carefully operated, their use is at-

tended by serious dangers to persons and property. In the public interest the State may make and enforce regulations reasonably calculated to promote care on the part of all residents and nonresidents alike, who use its highways.'

"The permission to operate a motor vehicle upon the highways of the Commonwealth is not embraced within the term civil rights, nor is a license to do so a contract or a right of property in any legal or constitutional sense. . . .

"Automobiles are vehicles of great speed and power. The use of them constitutes an element of danger to persons and property upon the highways. Carefully operated an automobile is still a dangerous instrumentality, but when operated by careless or incompetent persons, it become an engine of destruction. The legislature in the exercise of the police power of the Commonwealth not only may but must prescribe *how* and *by whom* motor vehicles shall be operated on the highways. One of the primary purposes of a system of general regulation of the subject-matter, as here by The Vehicle Code, is to insure the competency of the operators of motor vehicles. Such a general law is manifestly directed to the promotion of public safety and is well within the police power": Commonwealth v. Funk, 323 Pa. 390, 395, 396.

What is the legislative intent as evidenced by legislation relative to these questions? We have already stated the penalty provided. In addition thereto the several acts provide that "The secretary may suspend the privilege of any person" for a variety of reasons among which is "That such person has committed any violation of the motor vehicle laws of this Commonwealth."

We know that for certain violations of The Vehicle Code suspension or revocation of the operator's privilege is mandatory. The mere fact that the legislature made permissive provision in cases such as the instant

one is evidence that it recognized that excessive speed alone may or may not be such as to warrant the imposition of an additional penalty. To penalize by regimentation and by class is a step backward and not in conformity with legislative intent.

All the decisions dealing with this question have considered all the factors involved and especially with respect to reckless driving. The legislature, having provided one penalty, realized that the offense might be of greater gravity and thus made provision for the imposition of a more severe punishment. It is thus apparent that the legislature did not intend mass penalty. If it had so intended it would have made revocation of the operator's license mandatory in all cases of "speeding."

And now, September 29, 1942, the action of the Secretary of Revenue is reversed and set aside and the appeal sustained.